```
 1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3
    UNIVERSAL TRUCKLOAD, INC.    *   Civil No. H-15-1651
 4                               *
    VERSUS                       *   Houston, Texas
 5                               *   February 24, 2017
    DALTON LOGISTICS, INC.,      *   10:30 a.m.
 6  et al                        *

 7

 8                      MOTION HEARING
            BEFORE THE HONORABLE ALFRED H. BENNETT
 9              UNITED STATES DISTRICT JUDGE

10  For the Plaintiff:

11          Mr. Ryan Thomas Hand
            Lorance & Thompson PC
12          2900 North Loop West
            Suite 500
13          Houston, Texas 77092

14

15          Mr. Daniel Lee Fulkerson
            Roberts & Kehagiaras LLP
16          2950 N. Loop West
            Suite 500
17          Houston, Texas 77092

18

19  For Dalton Logistics:

20          Mr. Lawrence Scott Rothenberg
            Mr. Jason Hanke
21          Attorney at Law
            9525 Katy Freeway
22          Suite 300
            Houston, Texas 77024
23

24  Proceedings recorded by mechanical stenography, produced by
    computer aided transcription.
25
```

1  Appearances - Con't:

2

3  For Hess Corporation:

4           Ms. Mini Kapoor
            Mr. Michael J. Mazzone
5           Mr. Steven Messer
            Haynes & Boone LLP
6           1221 McKinney Street
            Suite 2100
7           Houston, Texas 77010

8

9  For Helmerich & Payne, Inc.:

10          Mr. Thomas A. Swafford
            Adams and Reese LLP
11          424 Church Street
            Suite 2700
12          Nashville, Tennessee 37219

13

14 For Four Seasons Equipment, Inc.:

15          Ms. Laurie Munoz
            McCormick, Lanza & McNeel, LLP
16          4950 Bissonnet Street
            Bellaire, Texas 77401
17

18

19 Court Reporter:

20          Fred Warner
            Official Court Reporter
21          515 Rusk Ave.
            Houston, Texas 77002
22

23

24

25

1          THE COURT:  Cause number 15-CV-1651, Universal

2  Truckload, Inc. versus Dalton Logistics, Inc., et al.

3              Counsel, please announce your appearances for

4  the record.

5          MR. HAND:  Your Honor, this is Ryan Hand for the

6  plaintiffs.  I have Dan Fulkerson with me for Universal

7  Truckload.

8          THE COURT:  Very well.

9          MS. KAPOOR:  Your Honor, for defendant Hess

10  Corporation, Mini Kapoor from Hanes & Boone, and I have with

11  me Mr. Michael Mazzone, he's a partner on this case, and Mr.

12  Steven Messer, another associate on this case.

13          THE COURT:  Very well.

14          MR. HAND:  Your Honor, if you don't mind, we also

15  have the other parties present today if there is anything

16  related to the case that you would like to discuss.  We know

17  we have our trial coming up.  I just wanted to inform the

18  Court that all the parties are here maybe except for one;

19  just to offer that up, Your Honor.

20          THE COURT:  Did you all want to make an appearance

21  or are you just going to observe?

22          MR. ROTHENBERG:  Judge, I am Lawrence Rothenberg.  I

23  am here for Dalton.  And this is Jason Hanke.  He is with our

24  office.

25          MS. MUNOZ:  Your Honor, I am Laurie Munoz for the

1  Four Seasons defendants.

2          THE COURT:  Very well.

3          MR. SWOFFORD:  Your Honor, I am Tony Swofford for

4  Helmerich & Payne.

5          THE COURT:  Very well.

6                  On today's docket for consideration is the

7  motion for summary judgment, Document 88-1.

8                  There is also a motion with a response.  There

9  is also a motion to strike the reply and then a motion to

10  file said reply.

11                  Then there is a motion for summary judgment,

12  Document No. 114-1, with response being Document No. 117-1,

13  which is also a motion for summary judgment against defendant

14  Hess and a response to Hess's motion for summary judgment.

15                  There are several other pending motions which

16  are not ripe as of yet because some of the motions for

17  summary judgment were filed earlier this month and a response

18  has not yet been filed and we have not yet received a reply.

19                  So, in regard to the defendant Four Season,

20  Inc.'s motion for summary judgment, Document No. 88, ready to

21  proceed?  Is that going to be heard today?

22          MS. MUNOZ:  Your Honor, I do not believe that was

23  going to be heard today.

24          THE COURT:  Okay.

25          MS. MUNOZ:  That is supposed to be heard sometime

1  next week.

2          MR. HAND:  That's correct, Your Honor.  We are in

3  the process of trying to schedule a hearing for that.

4          THE COURT:  Very well.

5          MS. KAPOOR:  I think the only motion set for motion

6  is Hess's motion for summary judgment.

7          THE COURT:  Very well.  Your motion?

8          MS. KAPOOR:  Yes, sir.

9          MR. HAND:  Yes, Your Honor.  We have a counter

10 motion.

11          THE COURT:  Right, which is part of the reply, a

12 response to it.

13          MR. HAND:  Yes, Your Honor.

14          THE COURT:  Very well.

15          MS. KAPOOR:  May I proceed, Your Honor?

16          THE COURT:  You may.

17          MS. KAPOOR:  Do you mind if I use the podium?

18          Your Honor, I would first like to thank the

19 Court for allowing oral argument today.

20          Did you want me to use this?

21          THE COURT:  Easier for the court reporter.

22          MS. KAPOOR:  And I personally appreciate the

23 opportunity and experience to argue here today as an

24 associate.

25          In this case Universal has sued multiple

1    defendants, lumped them all together in one bucket.  We

2    believe this does not work because every defendant in this

3    case is uniquely situated.

4              As to Hess, we don't know why we are in this

5    case.  Universal has sued Hess for a breach of contract for

6    providing transportation services, but there is no contract

7    between Hess and Universal.  There is no written contract,

8    there is no oral contract, there is no promise of any kind by

9    Hess to Universal.

10             Universal's corporate representative and

11   President, Universal's Director of Corporate Development,

12   Universal's CFO at the time all testified that there was no

13   interaction between Hess and Universal.

14             Now, plaintiff asserts that there are bills of

15   lading in this case which were produced for the first time

16   when Hess saw them when they were produced in this case; that

17   these bills of lading for transportation imposed contractual

18   obligations on Hess.

19             There were no bills of lading ever provided to

20   Hess during the transportation.  Hess hired a rig mover,

21   Dalton, another defendant in this case, to move its rig

22   equipment as well as help with assembly and disassembly of

23   the rigs involved here.

24             Dalton fell short of the trucks it needed to

25   move those rigs, and Dalton contracted with Universal to

1    provide trucks.  Hess was never provided any bills of lading

2    by Dalton; Hess was never provided any bills of lading by

3    Universal.  Universal never provided any bills of lading to

4    Dalton.  The only pieces of paper that are produced as bills

5    of lading imposing obligations on Hess in this case are

6    pieces of paper that Universal drivers filled in for

7    Universal's internal record keeping for their payroll

8    purposes so the drivers could get paid.  These internal

9    documents suddenly are elevated to the level of contractual

10   obligations on a party like Hess that never ever received

11   these pieces of paper.

12            Plaintiff also states that the party that

13   Universal actually contracted with, Dalton, was Hess's agent.

14   But in response to our motion for summary judgment, Universal

15   offers no evidence to rebut our argument against any agency.

16   Universal offers no argument to rebut our argument.

17            There is no contract between Hess and

18   Universal, so there can't be any liability.  There is no

19   agency application, agency principal application between Hess

20   and Universal because Universal never entered into a contract

21   with any of the Hess's agents.

22            Now, coming to my next point, Universal asserts

23   that Hess is liable under federal transportation law; and

24   that's a unique feature in this case with regard to Hess

25   because all the transportation that occurred in this case for

1   Hess was within the state of North Dakota, and the federal

2   transportation law that Universal is relying upon only

3   applies to interstate transportation.

4          All the moves that happened for Hess equipment

5   occurred between a point in North Dakota to another point in

6   North Dakota, never leaving the state.  So all the

7   transportation was within North Dakota.  The federal law that

8   applies only to interstate transportation is not applicable

9   here, and it's undisputed that all the transportation for

10  Hess occurred within North Dakota.

11         So no contract with Hess, no liability there;

12  no contract with an agent of Hess, no liability there, and

13  federal transportation law that Universal is relying upon

14  does not apply here.

15         And I meant to mention with regard to the bills

16  of lading, that's a unique feature as well with regard to

17  Hess.  As compared to other defendants that may have created

18  the bills of lading, received the bills of lading or

19  otherwise had notice of the terms of the bills of lading,

20  Hess had none of those, so that's another unique feature.

21  Plaintiff cannot put all the defendants in one bucket here

22  because every single defendant is uniquely situated.

23         There is another point that's unique in this

24  case with respect to Hess.  Unlike other defendants, there

25  are express written contracts regarding all the Hess's moves

1    that control payment liability.

2              There are two express contracts in place here.

3    Hess contracted with its rig mover, Dalton, whereby Dalton

4    provided services to Hess that were already move related.

5    Hess paid Dalton; Dalton provided service to Hess.  Hess

6    fully paid Dalton.  There is no dispute about that.

7              Dalton, as I said earlier, fell short on trucks

8    and it contracted with Universal, and under its contract with

9    Universal, Universal would provide trucks to Dalton and

10   Dalton would provide payment for those trucks.

11             Those were the contractual arrangements,

12   express detail contractual arrangements in place in this

13   case.  Other defendants may or may not have these, but

14   definitely Hess, this is a unique feature about Hess.

15             So the contracts really expressly allocate

16   responsibility among these three parties as to who to pay

17   whom.  Under these contracts Hess pays its rig mover.  The

18   rig mover has, unbeknownst to Hess, has a contract with

19   Universal and the rig mover pays Universal.

20             So the recourse, if the rig mover doesn't pay

21   Universal, Universal's recourse is against the party it

22   contracted with, not against a third party like Hess which

23   never ever interacted with Universal.  There is no documents

24   exchanged with regard to any consent on the part of Hess that

25   it was agreeing to be liable to Universal.  There was never a

1   meeting of the minds.

2            So no contract with Hess, no liability there;

3   no liability under agency principles.  Universal never

4   entered into any contract with an agent of Hess.  Federal

5   transportation law does not apply because that applies only

6   to interstate transportation, and all transportation for Hess

7   in this case were intrastate, undisputed.

8            And then there is a fourth issue that I just

9   mentioned.  There are express contracts where the three

10  parties have decided who will pay whom, express allocation of

11  payment responsibility.  These are really clearly not liable.

12  My client is not liable.

13           Now, if the Court -- and I am really moving on

14  to really my last major point here -- if the Court is

15  inclined to allow Universal to assert its newly claimed, new

16  claims under North Dakota law, which happened for the very

17  first in Universal's response to our motion for summary

18  judgment, that law support Hess as well.

19           The closest case is E.W. Wylie, which is a

20  North Dakota Supreme Court case.  And Universal admits that

21  under this case parties, as the parties here can allocate

22  liability.  And indeed Universal cites to E.W. as the

23  controlling law, and we agree; but E.W. does not support

24  Universal's position.  E.W. supports Hess's position.

25           And with the Court's permission, Your Honor, if

1   I may, I have a chart here which is really a blown-up version

2   from our briefing.  If I may use the Elmo to project it out.

3              Please let me know, Your Honor, when you are

4   ready.

5              THE COURT:  Go ahead.  Thank you.

6              MS. KAPOOR:  Thank you.

7              So looking at this chart, and just for the

8   court records, this chart was included in Docket No. 131 on

9   page 8.  It's just really a blown-up version of that chart.

10             There are two parts here.  There is this case

11  and there is E.W. Wylie.  And just in looking, giving it a

12  cursory glance, the similarity between the contractual

13  arrangements in the two cases, they're almost mirrored.

14             In E.W. Wylie, Menard, a party just like Hess,

15  contracted with a middleman like Dalton for transportation of

16  lumber in that case.  Under the agreement between the

17  defendant Menard and the middleman ITA in E.W. Wylie, Menard

18  was supposed pay ITA, the middleman.  ITA was supposed to

19  provide services.

20             Now, ITA went to the middleman, entered into a

21  contract with a carrier, just like Universal here.  It's

22  called Wylie in that case.  And under that contract ITA was

23  supposed to pay Wylie and Wylie was supposed to perform

24  services under that contract.  Menard, the defendant, was not

25  a party to the contract between ITA and Wylie, just like in

1  this case.

2          Hess is not a party to the contract between

3  Universal and Dalton.  Universal is not a party in the

4  contract between Hess and Dalton.

5          So in Wylie, for various reasons ITA, the

6  middleman, did not pay Wylie, their carrier, just like here.

7  And Wylie sued the defendant Hess -- defendant Menard in that

8  case just like Universal sued Hess in this case.

9          The Court said, parties, you have, or carrier,

10  you have contractually agreed with the middleman, ITA, to

11  provide services and get paid by ITA.  Your recourse is

12  against the middleman.  You cannot ask the defendant, just

13  like Universal is asking here from Hess, you cannot ask the

14  defendant to pay for this, what was owed by ITA.

15          So the Court did not allow collection of the

16  amount owed by ITA.  The Court saw there was no contract

17  between Wylie and Menard, just like there is no contract

18  between Universal and Hess, no liability.

19          So, what do we get from here?  Both parties

20  agree that E. Wylie is the controlling case, but E. Wylie

21  supports, really mirrors the facts in this case; and there

22  the Court clearly said your recourse carrier is against your

23  middleman, the party you actually contracted with.

24          There is more, because the facts here are even

25  more favorable than E.W.  There are two important facts.  The

one I have already mentioned is there were no bills of lading provided to Hess.  In E.W.  the defendant actually received bills of lading, and even that was not sufficient.  The Court said, this is not sufficient to impose liability on the defendant.

Here Hess never received bills of lading.  And the second fact that I think is even more favorable in this case is, during the time the Hess rig moves were going on, Hess was paying Dalton; but unbeknownst to Hess, Universal and Dalton entered into negotiations whereby Universal was going acquire Dalton, and Universal unilaterally, with no notice to Hess, allowed Dalton to suspend payments.  Hess has no knowledge about this because Hess assumed they're coming in.

So really now after all this, Universal is seeking payment from Hess.  Its recourse is against the party contracted with.  Its recourse is against the party that it unilaterally allowed it to suspend payments.  Its course is not against Hess, who -- and the other thing is, Universal, not only are there no bills of lading, Universal never, ever sent a single invoice.  There are like 55 invoices, about 55 invoices listed in the demand letter that Hess received.

Not a single invoice was sent to Hess.  Hess is not listed on the invoices.  The invoices list Dalton and Dalton only.  Invoices were sent to Dalton and Dalton only.

1   The payment was demanded from Dalton and Dalton only until

2   Hess received the demand letter itself.  That was right

3   before the lawsuit.

4            Universal, over an entire year while these

5   payments are piling up, becoming overdue, while they're

6   negotiating acquisition, nobody ever informs, Universal never

7   informed Hess saying that, hey, your rig mover is not paying

8   us, no information to Hess.  And so, Universal's recourse is

9   against Dalton, if any, not against Hess.

10            So to conclude, Your Honor, no contract between

11  Hess and Universal, no liability there; no agency, no

12  liability under agency at all because Universal never entered

13  into any contract with an agent of Hess and has not responded

14  to our arguments in that respect.

15            No liability under federal transportation law

16  because everything was within the state of North Dakota and

17  federal transportation law does not apply there.

18            And finally, there are express contracts just

19  like in E.W. Wylie where parties have agreed to allocate

20  liability.

21            Hess's motion should be granted.

22            Thank you, Your Honor.

23       THE COURT:  Thank you, counsel.

24            Counsel, response.

25       MR. HAND:  Thank you, Your Honor.  Would you like me

1  to use the podium or from here?

2  THE COURT:  Wherever you are comfortable.

3  MR. HAND:  Thank you, Your Honor.

4  First of all, I do appreciate the Court taking

5  time to hear this matter.  I am honored to be here on behalf

6  of Universal Truckload.  Universal is a motor carrier, a

7  trucking company located in Michigan.  They do both

8  interstate, moves between states, and intrastate, strictly

9  within one state moves.  They have USDOT motor carriage

10  authority and they are governed by the federal regulations in

11  the transportation code, Title 49 as well as for strictly

12  intrastate, in this case it's North Dakota, the North Dakota

13  rules, regulation and codes.

14  I think when you look at this case at first

15  blush -- and we have been dealing with this the whole time --

16  is that it comes down to, I think what they're saying through

17  their arguments is this isn't fair, Your Honor, we've already

18  paid.  We paid the middleman, Dalton Logistics.

19  In a sense it comes down to what they want to

20  make is a fairness argument because they say that there was

21  no contract, although that is in dispute.  This absolutely

22  was not a gratuitous move; there were multiple interactions

23  between Universal, the motor carrier, and Hess, the shipper

24  and receiver who would go and pick up their rig equipment,

25  receive it from Hess personnel, deliver for Hess.  There was

1   Hess on both ends of the shipment where it was Point A and

2   Point B within North Dakota.

3              Going back to this fairness argument, Your

4   Honor, saying we already paid the middleman so we shouldn't

5   have to pay twice.  There is a unique body of case law and

6   regulations regarding motor carriers to protect, Your Honor,

7   interstate commerce, the interest of interstate commerce and

8   motor carriers.

9              Motor carriage in interstate commerce and all

10  commerce, Your Honor, is so important to our economy, to our

11  country to keep the free flow of goods moving, Your Honor,

12  that there is a well-established body of case law that

13  says -- and I will get into that in a moment -- absent any

14  contract arrangement between the shipper, the receiver and

15  the motor carrier to somehow shift the obligation, the

16  ultimate obligation to get the carrier paid.  Absent that,

17  the consignor, which in this case is Hess, the shipper, is

18  responsible to pay.  So they're saying it's not fair to be

19  paid twice.

20             But there's also another unfairness.

21  Universal, the motor carrier, hasn't been paid.  So as we

22  stand now, there is unfairness potentially to both parties.

23  And so we come to the Court under the body of law, the

24  federal law and North Dakota law, a well-established carriage

25  law, that provides that the motor carrier gets paid absent

1    some contract.  And they do that so that interstate commerce,

2    intrastate commerce can freely move, that trucking companies

3    aren't burdened with the obligation to figure out the

4    creditworthiness of each party in the transaction.  They move

5    freight; they get paid absent some express agreement.

6          THE COURT:  When you say absent some contract, but

7    isn't it true that Universal did in fact have a contract with

8    Dalton?

9          MR. HAND:  Yes, Your Honor.  We had a contract with

10   Dalton, and it was very similar to the contract that you

11   could see in the Excel case, which is that, this is the

12   middleman.  The contract says you look first to Dalton as the

13   middleman, as the broker.

14          And then there is nothing in the contracts, the

15   case law that we have cited, whether it be Wylie, Western

16   Home, Excel.  They say that unless there is an agreement

17   between the shipper and the motor carrier there is no

18   agreement here about payment obligations.

19          The only contract there is is between Universal

20   and -- a written contract between Universal and Dalton that

21   says we'll come to you first because Universal -- I am

22   sorry -- Hess is actually new to Dalton as the middleman to

23   get this stuff shipped.  They have a complicated

24   contractual -- not all that complicated actually, but they've

25   got a book almost of contracts, which this is the master

1    service agreement between Dalton and Hess.  And in this

2    contract it allows for subcontracting of this to third

3    parties of the obligations under the contract.

4            On page 120 -- I'm sorry.  I don't know if I

5    answered your question, Your Honor.

6            But you're right.  There is no contract between

7    Universal and Hess other than the contract of the bill of

8    lading, the implied in law or implied in fact contract

9    because there was a relationship.  And under North Dakota

10   law, which we agree governs, and our second amended complaint

11   recognizes that this is a contractual matter.  We've pled

12   both contract and quasi contract because Universal showed up

13   and interacted with Hess on a regular basis to transport

14   multiple loads for the benefit of Hess so that Hess could go

15   to these various rig drilling sites.

16           THE COURT:  I don't think there is any question that

17   Hess received a benefit.  It had its goods moved.  But the

18   question is, in regards to the liability for the move, I

19   believe that from even your response and from the motion for

20   summary judgment, Universal was contacted by Dalton for this

21   move, and it was instructed by Dalton where to go to pick up

22   the shipment at Hess, where to deliver the shipment that was

23   going to be picked up at Hess, and it turned out Point A to

24   Point B was Hess.  Correct?

25           MR. HAND:  Yes, Your Honor.

1       THE COURT:  But all that direction came from Dalton,

2   the middleman?

3       MR. HAND:  Right, on behalf of Hess.

4       THE COURT:  And the invoices that Universal issued

5   were issued to Dalton?

6       MR. HAND:  Initially, Your Honor.

7       THE COURT:  Was there ever a time prior to, as

8   counsel pointed out, the demand or the filing of this

9   lawsuit, where a invoice was sent to Hess?

10      MR. HAND:  After Dalton defaulted on its

11  obligations, because the contract says you look first to

12  Dalton, not exclusively, but first.  When it became clear

13  that they were not going to pay, after repeated requests for

14  payment, because that's where we had to go first, then we

15  sent a demand, a detailed demand with every single freight

16  charge to Hess saying, listen, Dalton has defaulted and these

17  need to be paid.  You were the shipper, you were the

18  receiver, the consignor, the consignee.  You got the benefit,

19  so we are now asking that you pay.

20          And that scenario is exactly what was discussed

21  in Excel Transportation, it's precisely on point, where the

22  Southern District of Texas, applying essentially

23  well-litigated and an extreme long history of carrier law

24  that law says, and I quote from this opinion, "the Bedrock

25  rule of carriage cases is that absent malfeasance, the

1   carrier gets paid.  It is superficially unfair that Excel and
2   Marriott" -- they were the shippers and the original freight
3   forwarder third party.  They already made a payment.  The
4   shipper, being Marriott, made a payment to -- there were two
5   brokers in the middle.  But the motor carrier didn't get
6   paid.

7           So it says, the opinion says "it's
8   superficially unfair that Excel and Marriott must pay for the
9   shipments twice.  However, allowing them the benefit of
10  carriage without compensation, the carrier would eventually
11  cripple the shipping industry and the economy generally as
12  carriers devoted their time to investigate potential
13  customers."

14          And it goes on to talk about just because you
15  look one place first, that doesn't prevent the carrier from
16  going to the consignor or the consignee once the middleman,
17  the broker, defaults, because that is the party that received
18  the benefit of the service, and that is the party, even under
19  North Dakota law there's a statute that we've cited in the
20  Century Code that says absent a express waiver, absent some
21  arrangement between the motor carrier and the
22  consignor/consignee that says that the burden of paying the
23  freight charges shifts, it stays with the consignor.

24          Hess is a sophisticated corporation.  It had an
25  opportunity on multiple occasions to negotiate payment.

1          THE COURT:  What benefit did Hess get from

2     contracting with Dalton then if in fact that it was going to

3     be liable for these charges if in fact Dalton didn't pay?

4     What benefit was it to Hess to contract with Dalton?

5          MR. HAND:  That they wouldn't have to, Your Honor,

6     go out and find the motor carrier.  It's like a broker in the

7     middle.  The benefit is is that we don't know where these

8     trucks are.  We need trucks to get our freight moved quickly

9     and timely around North Dakota so we can drill for oil and

10    gas.

11          The benefit they got was they shipped it to a

12    third party to make those arrangements.  It's very common in

13    the shipping industry you got a broker in the middle, the

14    customer, the shipper --

15          THE COURT:  Well, I get that portion.  But what

16    contractual benefit did it get?  Did it get any insulation

17    from a suit such as this by contracting with Dalton instead

18    of contracting directly with Universal?

19          MR. HAND:  Yes.  There is no insulation in the

20    contracts that says, that provides that the motor carrier

21    can't go back against Hess.  The benefit they got was the

22    brokerage.

23          The contracts expressively state that under the

24    scenario, if you look to -- there's a mechanism under Section

25    4.5, page 100 of the MSA, the Master Service Contract between

1    Hess and Dalton that says the contractor, which is Dalton,
2    hereby authorizes the company to deduct or withhold from
3    payment due the contractor without liability for interest all
4    amounts for which company, Hess, may become liable to third
5    party by reason of the contractor's failure to pay its
6    suppliers of materials and labor.

7             So they had an express provision in the
8    contract that says, yes, you can use subcontractors.  It's
9    mentioned throughout the Master Service Agreement.  Dalton
10   usually used subcontractors.  But if you don't pay them, we
11   have a way, a mechanism to make sure that those third party
12   contractors get paid and they're not stuck in the middle by
13   an unscrupulous party that brokers the freight.

14            And that's again a point that is made in the
15   Excel case where the Judge, the Court says that CSX -- that
16   was the carrier, a rail carrier -- neither released Excel
17   from liability nor misrepresented the payments.  It's Excel's
18   responsibility to choose a subcontractor that can forward
19   monies as well as freight.  It was the shipper who had the
20   obligation to make sure that the middleman was getting the
21   payments to the right people.

22            And in this case, Your Honor, they just turned
23   a blind eye.  They knew that Universal was shipping this
24   freight.  They showed up there on a regular basis, and there
25   was no payment for almost $700,000 worth of shipments that

1    were being made.  And that is the type of inequity that the

2    federal common law, North Dakota law says in order to protect

3    commerce, we say that the burden rests on the consignor or

4    consignee to shift the obligation away from this.  You cannot

5    use a third party to get around that obligation unless you do

6    so with a agreement between the motor carrier and the

7    consignor or consignee.

8              THE COURT:  Thank you, counsel.

9              Anything else?

10             MR. HAND:  On the point that, Your Honor, they make

11   that the cause of action was not timely pled, this cause of

12   action is front and center in our second amended complaint.

13   We reference intrastate shipments, we reference contract law,

14   we reference federal law, but we also reference intrastate

15   shipments.

16             North Dakota bills of lading are attached to

17   the complaint.  So these shipments in North Dakota were all

18   intrastate, is what's pled in the lawsuit.  So it's not a new

19   cause of action.  It's just a code section that establishes

20   where ultimate liability should rest in the absence of a

21   contract that says it ships somewhere else.  So I just wanted

22   to make that point, Your Honor.

23             And if you don't mind, this diagram, can I

24   point out a couple of things on the diagram, Your Honor?

25             THE COURT:  Yes, sir.

1              MR. HAND:  On the diagram, it's not completely
2    accurate because, first of all, the Wylie case is interstate
3    federal law, number one.  This is North Dakota law where you
4    have a statute says the consignor is presumed liable.

5              Number two, there is no middleman here.  This
6    was Wylie, the motor carrier, had contracted with IKEA, or
7    IKA to haul freight to Menard.  There was non middleman and
8    there is also freight terms.  They were discussed in the case
9    said that says it's free on board, FOB.  There is no freight
10   terms here.  Hess was free, if they wanted to, to insist on
11   freight terms.  There were no freight terms.  They could have
12   said, when you pick these up, we need to have an agreement on
13   freight terms.  There is no such agreement.

14             Difference here again, we have Hess has the
15   freight, contracted a third party to make sure that it gets
16   shipped.  Then Dalton says, okay, Universal, you handle the
17   Hess freight.

18             This is way the diagram looks is because
19   there's a middleman.  There is no middleman in Wylie.  And
20   the North Dakota statute, the Century Code says that absent
21   that contract that says otherwise, the consignor, the shipper
22   has to pay.  So there was constant interaction between
23   Universal and Hess that's being completely overlooked by Hess
24   in this case.

25             So there's a major difference between the way

1    the parties were aligned between Wylie and this case.  The
2    law is slightly different because in Wylie there was no code,
3    that regulatory scheme that said that the consignor or
4    consignee had to pay.  They went strictly on what the parties
5    contracted to; and the parties, including the FOB terms,
6    there are no FOB terms, shipping terms, any of that nature,
7    although those bills of lading -- and there's testimony --
8    were given to Hess and they're signed.  There's, if nothing
9    else, a fact issue about those bills of lading; but North
10   Dakota law doesn't even require a bill of lading.
11              It's clear that Universal is transporting this
12   freight for the benefit of Hess with Hess's express
13   permission, you show up with a Universal truck.  Their
14   manager, who testified, or corporate representative, said,
15   yeah, we saw Universal show up all the time.  We knew
16   Universal was handling this freight.
17              Well, what did you do to protect Universal?
18   They did nothing.  They could have under their own contracts,
19   but they didn't.  And there is nothing in any of these
20   contracts that say that the motor carrier waives it right to
21   an express contract that says we can't go back after the
22   party who set this whole thing up.
23              THE COURT:  Very well.
24              MR. HAND:  Thank you, Your Honor.
25              THE COURT:  Very brief response.

1          MS. KAPOOR:  Yes, Your Honor.  Thank you.

2               Your Honor, first let me address Excel.

3     Universal has cited extensively to Excel, relies a lot on

4     Excel but really looks at the conclusion of Excel but does

5     not look at how the Court arrived at that conclusion.

6               There the party is a party like Hess, had a

7     history of interaction, invoices sent to a party like Hess by

8     the carrier.  And the party like Hess had notice of the terms

9     of transportation.  That's not the case here.

10              Universal cites to the Bedrock Rule applied by

11    Judge Hughes in that opinion.  Judge Hughes' opinion is based

12    on the interstate law applicable to that case; and even if

13    this were an interstate case, the facts are completely

14    different.

15              Mr. Hand says there was constant interaction

16    between Hess, the drivers are coming into the site and

17    dropping.  If you look at the testimony, the summary judgment

18    evidence, our corporate representative said, yeah, we

19    occasionally saw Universal trucks.  That does not rise to the

20    level of a contract with Hess.  Universal's contract was with

21    Dalton and Dalton alone.

22              And the FOB terms issue, the issue here is

23    Dalton leased trucks from Universal because it was short on

24    trucks.  It was not a per shipment basis.  Bills of lading

25    are not the issue here because it's the shipment, not the

1    shipment, but the trucks itself that are being leased, and
2    they're being used for any and every kind of shipment.  There
3    is no per shipment transportation agreement.

4                And then finally I want to say that Mr. Hand
5    has twisted our argument into a fairness argument.  We never
6    made any fairness argument in any of our briefing.  We have
7    made an argument based on the legal law that's applicable in
8    this case.

9                And finally, the North Dakota Century Code that
10   Mr. Hand talked about and is in their briefing, it provides,
11   it was codified in 1877, provides a mechanism for allocating
12   liability between a consignor and consignee.  It does not
13   address a situation where there's a third party like Dalton
14   in this case.  So we do not even believe that code has
15   anything to do with this case.

16               And then as far as Wylie is concerned, the
17   contractual arrangement mirrors this case.  The Court said
18   contract law ordinarily determines who is liable for payment
19   for freight charges under common law.  The Court then looks
20   at the contractual arrangements and say, carrier, your
21   recourse is only against the defendant, not against -- I'm
22   sorry -- against the middleman, not against the defendant.
23   It's very clear.

24               And Universal cites to no authority where North
25   Dakota or any other case has found a party like Hess liable

1   that never received any terms of the alleged contract, the

2   bills of lading; and Universal doesn't cite to any authority

3   where a party like Hess, who's already paid, is liable to a

4   third party, which this party never had interaction with.

5              So we believe Hess's motion should be granted.

6         THE COURT:  Thank you, counsel.

7              Last word.

8         MR. HAND:  Thank you, Your Honor.

9              It's clear what Hess is doing here is using a

10  middleman to try to get around a payment of certain third

11  parties.  And the contract between Dalton and Hess provides a

12  mechanism so that the third parties, innocent third parties

13  like Universal gets paid.

14             They ignore a body of case law that says the

15  bedrock principle is a carrier gets paid absent malfeasance

16  and absent a contract between the two, the motor carrier and

17  the consignor/consignee that shifts the obligation to pay.

18  There is no contract here that Hess entered into with

19  Universal that says, Universal, you waive the right to go

20  after us.

21             They have could have as a sophisticated company

22  required bills of lading to say, guess what?  Once we pay

23  Dalton, we're done.  We delivered bills of lading per

24  Dalton's corporate representative.  We delivered bills of

25  lading signed that contain none of that, the Section 7

1   non-recourse language to absolve Hess from paying it.  So
2   they are required to pay.
3           The whole part of a privity and contract -- and
4   this is an independent contractor -- that's also discussed in
5   Excel.  In Excel the Court said, since Excel was neither
6   Cav's principal nor in privy with CXS, it feels it is
7   absolved of responsibility.  But Cav's status -- this is the
8   middleman -- as an independent contractor does not release
9   Excel from liability.
10          And then he goes the very next paragraph
11  talking about the Bedrock Rule that the carrier gets paid in
12  order so that interstate commerce can continue to move and
13  shippers, consignors, consignees that utilize motor carriers
14  have to make sure that a carrier gets paid so that commerce
15  continues.
16          In an area like Houston where we have multiple
17  transactions, a shipper cannot put middlemen in the middle
18  and absolve itself of any responsibility to get the actual
19  carrier, the one who does the work, paid.  Carriers would
20  shut down if companies like Hess were allowed to just find
21  some middleman and shift everything off on the middleman, and
22  then the middleman folds and then they can say, nope, we're
23  not responsible.
24          The law is designed to protect motor carriers,
25  to protect interstate commerce and keep the free flow of

```
 1  goods going, and that's a long-standing principle as
 2  referenced in Excel, which is embodied in the state law in
 3  North Dakota that says the consignor is presumed to be liable
 4  absent some contract, which there is none here that they
 5  could have entered into and said we want you to waive your
 6  rights against us.
 7                  Thank you, Your Honor.
 8           THE COURT:  Counselor, the other point is that there
 9  was a motion to strike I think your reply.  Is that correct?
10           MR. HAND:  Not that I'm aware of.
11           THE COURT:  Was that the other motion?  Okay.
12                  Very well.  Thank you.  The Court will take it
13  under advisement.
14                  The Court would like to note that this oral
15  hearing was taking place pursuant to the Court's Rule A5
16  which allowed a lawyer who has been in practice, younger,
17  less than seven years, because she was primarily going to be
18  making the argument.  So, well done.
19           MS. KAPOOR:  Thank you, Your Honor.
20           THE COURT:  And, counselor, thank you for
21  recognizing the rule and putting forth your young lawyers.
22  It's very important to our profession to have young lawyers
23  to come to court to make arguments to participate such that
24  this art form that we have, being a trial advocate, will go
25  forward.  And so, the Court is very appreciative of you
```

1   taking advantage of that rule.

2            MR. MAZZONE:  And, Your Honor, we appreciate you

3   having the rule.

4            THE COURT:  Very well.

5                 Counsel, we are adjourned.  You are excused.

6   Have a good weekend.

7            MR. MAZZONE:  Judge, before you go, could we talk

8   about scheduling for a minute?  We are set for trial March

9   27th.  And I am sure you have heard this oftentimes from

10  lawyers.  We want to save our clients a little bit of money

11  not having to prepare for a trial that may not be necessary.

12           THE COURT:  Well, I understand there are a lot of

13  shoes, a lot of dominos and that there are several motions;

14  and so, I will endeavor, with the other things on my desk, to

15  get you a timely ruling.

16                In addition, I know that there are other

17  motions that are similar to this that need to be heard as

18  well in the next few weeks; and so, I am going to try to make

19  sure that that's done.

20                As I was noting when I first came out, I note

21  that there was a motion for summary judgment filed on

22  February the 6th.  So we haven't even received a response to

23  that yet, and then obviously the reply.  So some are just not

24  ripe yet, and so we have some more potential hearings or

25  deadlines to meet.

1       The Court appreciates you bringing that to its
2  attention, and I will keep that in mind.
3       MR. MAZZONE:  Thank you, Judge.
4       MR. ROTHENBERG:  Your Honor, just one question.  Do
5  you want all of these motions heard orally or are you fine
6  submitting them?
7       THE COURT:  I typically do these off the paper.  And
8  again, the Court has a rule, A5, which states that if there
9  is a lawyer in practice less than seven years and they wish
10  to argue the motion, the Court will make time for that.  And
11  so, counsel filed the request and the Court granted it.
12       And so typically I'll do these off the paper.
13  There may be a situation where I get into the paper and I
14  determine oral argument would be helpful, and then I will
15  call you in on that.  But that's kind of the default, is
16  doing it off the paper and then reverting to a oral argument
17  if necessary.
18       MR. ROTHENBERG:  Yes, sir.  Thank you, Judge.
19       MS. KAPOOR:  Thank you, Your Honor.
20       THE COURT:  Anything else?
21       All right.  Enjoy your weekend.  Again,
22  counsel, well done.
23       MS. KAPOOR:  I appreciate it, Your Honor.
24
25            (Conclusion of proceedings)

1                        CERTIFICATION

2

3

4

5          I, Fred Warner, Official Court Reporter for the

6    United States District Court for the Southern District of

7    Texas, Houston Division, do hereby certify that the foregoing

8    pages 1 through 32 are a true and correct transcript of the

9    proceedings had in the above-styled and numbered cause before

10   the Honorable ALFRED H. BENNETT, United States District

11   Judge, on the 24th day of February, 2017.

12         WITNESS MY OFFICIAL HAND at my office in Houston,

13   Harris County, Texas on this the 9th day of May, A.D., 2018.

14

15

16

17

18                         /s/ Fred Warner
                          Fred Warner, CSR
19                        Official Court Reporter

20

21

22

23

24

25